UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
INDIAN CAPITOL DISTRIBUTING, INC.
    Debtor.                                    No. 7-09-11558 SA

CRAIG H. DILL,
    Plaintiff,
v.                                             Adv. No. 11-1060 S

BRAD HALL & ASSOCIATES, INC.
    Defendant.

## MEMORANDUM OPINION IN SUPPORT OF
## JUDGMENT DISMISSING COMPLAINT

Plaintiff/Trustee Dill filed the complaint seeking recovery
of two $25,000 payments as preferential transfers. 11 U.S.C.
§547(b). Defendant Brad Hall & Associates, Inc. ("BHA")
responded by, among other things, asserting affirmative defenses
of a "contemporaneous exchange" and ordinary course of business
within the industry. For the reasons set out below, the Court
rules that the transfers were contemporaneous exchanges and were
also transactions conducted according to ordinary business terms
within the industry. The Court therefore will enter an order
dismissing the complaint.[1]

_____

[1] The Court has subject matter and personal jurisdiction
pursuant to 28 U.S.C. §§1334 and 157(b); this is a core
proceeding pursuant to 28 U.S.C. §157(b)(2)(F); and these are
findings of fact and conclusions of law as may be required by
Rule 7052 F.R.B.P. In addition, as required by the Court, BHA
filed a statement addressing this Court's subject matter
jurisdiction to hear and determine the matter at issue. BHA's
statement recited as follows:
    The undersigned party or parties **consent** to the
    bankruptcy court hearing and determining all claims and
    issues in this adversary proceeding and entering final
                                      (continued...)

**BACKGROUND**

Debtor filed its voluntary chapter 11 petition on April 14, 2009. The relationship between Debtor and BHA started in December 2006 when BHA opened an account for Indian Capitol Distributing, Inc. ("Indian Capitol" or "Debtor"). Starting in mid-2008 Indian Capitol ran up a large credit balance with BHA, which in the opening weeks of January 2009 exceeded $1,000,000. Suddenly learning what a disaster had unfolded for BHA, Brad Hall directly contacted Michael Mataya, president of Indian Capitol, and worked out an arrangement which provided for a continuing supply of fuel to Indian Capitol only in return for immediate payment of any further fuel purchases. Concerning the unpaid balance at that time – $907,334.08 – Mr. Hall authorized a collection action against Indian Capitol which resulted in a judgment against both Indian Capitol and Mr. Mataya which was entered on April 23, 2009 in Bonneville County, Idaho. Mr. Mataya also granted liens on various of his personal assets, and purported to provide a personal guarantee, to help assure payment of the past due debt.[2] Mr. Mataya provided an explanation to Mr.

_____

[1](...continued)
orders and judgments on all claims including money judgments as appropriate, subject to review under 28 U.S.C. § 158.
(Bolding in original.)

[2] The style of the case on the judgment listed Mr. Mataya as guarantor of Indian Capitol's debt. In fact, read carefully, the
(continued...)

Page 2 of 23

Hall about why the unpaid debt had ballooned. He stated that without his consent or knowledge, the State of New Mexico had suddenly garnished his checking accounts for allegedly past due obligations to the State, and that he was scrambling to recover the funds so he could pay creditors. Mr. Hall testified that he found this explanation convincing since BHA had experienced a somewhat similar experience earlier when it took BHA months and massive documentation to demonstrate to the Taxation and Revenue Department of the State of New Mexico that BHA had delivered certain quantities of fuel to the Navajo Nation and thus were not liable to the state for taxes on those deliveries.[3]

In effect Messrs Hall and Mataya drew a line underneath the $907,000 and instituted a new relationship which allowed Indian Capitol to continue to obtain fuel through BHA but only on condition that it pay immediately for any new purchases. During the period when the new agreement was in place, leading up to the petition date, Indian Capitol stayed largely current (taking into

---

[2](...continued)
guaranty agreement has Indian Capitol guaranteeing its own debt, with Mr. Mataya signing merely as president of Indian Capitol. BHA apparently first realized this during the trial.

[3] Of course the explanation did not constitute collateral, nor did it contribute to a paydown of the debt in any way. However, the explanation and Mr. Hall's acceptance of the explanation is further evidence that the parties had isolated the past due debt of $907,000 and were going forward on a new basis for additional supplies of fuel.

account the delivery of many truckloads of fuel each week) according to the agreement.[4]

On April 10 and again on April 13, 2012, shortly before the petition date of April 14, Indian Capitol made two payments by wire transfer, each in an amount of $25,000. According to BHA, the payments were applied to invoices dated April 2 and April 4. It is these two $25,000 payments that Trustee seeks to recover.

Specifically at issue are the following invoices and payments:

| Exhibits | Del. date | Inv. date | Inv. No. | Inv. Amt. | Pmt. date |
|----------|-----------|-----------|----------|-----------|-----------|
| 1, 68 | April 2 | April 2 | 11030**471**[5] | 15,971.84 | April 10 |
| 1, 69 | April 2 | April 2 | 11030**472** | 16,045.99 | April 10/13[6] |
| 1, 70 | April 2 | April 2 | 11030**473** | 15,994.38 | April 13 |
| 1, 71 | April 4 | April 4 | 11030**474** | 1,842.67 | April 13 |
| 1, 72 | April 4 | April 4 | 11030**475** | 16,444.21 | April 13[7] |
| 1, 73 | April 4 | April 4 | 11030**970** | 15,054.91 | not paid |

---

[4] The safeguards were not perfect; when Debtor filed its chapter 11 petition on April 14, 2009, BHA was owed over $983,000. This represented unpaid invoices issued on April 4 and April 6 (most of invoice no. 11030475 and all of nos. 11030970, 11030971, 11030972, and 11030973), totaling about $76,000. In describing what happened this way, the Court is not in any way downplaying the very considerable loss that BHA has incurred and which will certainly not be repaid.

[5] Bolding added by Court for ease of reference.

[6] Of the April 10 $25,000 payment, the first invoice (471) was paid in full and (25,000.00 - 15,971.84 =) $9,028.16 was applied to the second invoice (472). The remainder of the second invoice was paid by the April 13 $25,000 payment, which also paid in full the third and fourth invoices (473 and 474) and part – $145.12 – of the fifth (475).

[7] See footnote 6 above.

Case 11-01060-s    Doc 44    Filed 08/10/12    Entered 08/10/12 14:33:47 Page 4 of 23

```
1, 74      April 4[8]   April 6    11030971   14,403.24 not paid
1, 75      April 6     April 6    11030972   15,226.43 not paid
1, 76      April 6     April 6    11030973   15,226.43[9] not paid
```

Plaintiff's adroitly argued but ultimately unsuccessful position is two-fold: that the parties intended that payment for ongoing fuel deliveries be immediate but it was not, so that the "substantially contemporaneous" test was not met, and that the underlying data about the "ordinary business terms" was insufficient to support a conclusion that the payment terms were ordinary.

**ANALYSIS**

To prevail on his case in chief, Plaintiff must prove all five elements of 11 U.S.C. § 547(b), which provides:

> Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made--
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if--

---

[8] The single digit that constitutes the date on the photocopy of the attached bill of lading is garbled/jumbled so as to be unreadable. It could be April 4, 5 or 6. But because this invoice went unpaid, it does not make a difference.

[9] Sic. The bills of lading for the two invoices (972 and 973) show the exact same amount charged for each sale.

Page 5 of  23

(A) the case were a case under chapter 7 of this
title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to
the extent provided by the provisions of this
title.

The Court finds that Trustee easily proved his prima facie
case. The two payments were made directly to BHA, for loads of
fuel that Indian Capitol drivers had already picked up[10], within
days (or a day) of the filing of the petition. Debtor was then
(and remains) hopelessly insolvent, and of course if the payments
had not been made, BHA would in the end be out $50,000 more than
it already is (or very close thereto).

Defendant argues that the transfer is not avoidable under
sections 547(c)(1) and 547(c)(2)(B)[11] which provide:

_____

[10] A hand-written notation on one of the bills of lading
says "Plaza". Hall exhibit 68 (H-68). The evidence suggests
strongly that the notation was put on the bill of lading by the
Indian Capitol driver. In any event, Trustee has argued that
this means that the fuel was likely delivered to Mr. Mataya's
Travel Plaza and not to one of Debtor's locations. Assuming that
is true (and it probably is), it makes no difference. At the
time BHA had only one account with a Mataya entity, and that was
Indian Capitol. Once the fuel had been picked up by an Indian
Capitol driver, it was in Indian Capitol's possession, and Indian
Capitol was liable for payment, regardless of what Indian Capitol
did with the fuel. Of the other four bills of lading attached to
the invoices sent to Indian Capitol, another says "Plaza" (H-71);
one says "B-Plant" (presumably Debtor's bulk plant) (H-69); H-70
says "[illegible]_East"; and H-72 says "Texaco North". In
addition to the bulk plant, Indian Capitol operated several
locations from which it retailed fuel.

[11] BHA withdrew its defenses of ordinary course of business
or financial affairs between Debtor and BHA, §547(c)(2)(A), and,
conditioned on Trustee not seeking any recovery other than the
(continued...)

Page 6 of  23

The trustee may not avoid under this section a transfer--
(1) to the extent that such transfer was--
(A) intended by the debtor and the creditor to or for whose
benefit such transfer was made to be a contemporaneous exchange
for new value given to the debtor; and
        (B) in fact a substantially contemporaneous
exchange;
(2) to the extent that such transfer was in payment of
a debt incurred by the debtor in the ordinary course of
business or financial affairs of the debtor and the
transferee, and such transfer was--
(A) made in the ordinary course of business or
financial affairs of the debtor and the transferee; or
        (B) made according to ordinary business terms;

**Section 547(c)(1) defense:**

In <u>Gonzales v. DPI Food Products Co. (In re Furrs

Supermarkets, Inc.)</u>, 296 B.R. 33, 39 (Bankr. D. N.M. 2003), this

Court stated the following:

        Section 547(c)(1) protects transfers from attack if (1)
the preference defendant extended new value to the debtor,
(2) both the defendant and the debtor intended the new value
and reciprocal transfer by the debtor to be contemporaneous
and (3) the exchange was in fact contemporaneous.
        The purpose of the contemporaneous exchange
        exception ... is to encourage creditors to
        continue to deal with troubled debtors without
        fear that they will have to disgorge payments
        received for value given.  If creditors continue
        to deal with a troubled debtor, it is possible
        that bankruptcy will be avoided altogether.
5 Alan N. Resnick & Henry J. Sommer, <u>Collier on
Bankruptcy</u> ¶ 547.04[1], at 547- 47-48 (15th ed. rev.
2003)(Footnotes omitted.)  The parties' intent to make
a contemporaneous transfer is an essential element of a
section 547(c)(1) defense.  <u>Lowrey v. U.P.G. Inc. (In
re Robinson Bros. Drilling, Inc.)</u>, 877 F.2d 32, 33 n.1

─────────────────────

        [11](...continued)
two $25,000 payments, its defense of "new value".  §547(c)(4).
Trustee stipulated that it was seeking no other recovery from
BHA.

Case 11-01060-s   Doc 44   Filed 08/10/12   Entered 08/10/12 14:33:47 Page 7 of 23

(10th Cir. 1989). See also Harrah's Tunica Corp. v.
Meeks (In re Armstrong), 291 F.3d 517, 525 (8th Cir.
2002) (the parties' intent is the critical inquiry)
(quoting Official Plan Comm. v. Expeditors Int'l of
Washington, Inc. (In re Gateway Pacific Corp.), 153
F.3d 915, 918 (8th Cir. 1998)).  The section protects
transfers that do not result in diminution of the
estate because unsecured creditors are not harmed by
the transfer if the estate was replenished by an
infusion of assets that are of roughly equal value to
those transferred.  Manchester v. First Bank & Trust
Co. (In re Moses), 256 B.R. 641, 652 (10th Cir. B.A.P.
2000).

In this case, the Court finds that both the April 10 and April 13
payments fit this defense.

That in early 2009 the parties intended to change their
relationship – effectively begin again – is apparent from the
testimony and from the course of payments thereafter. Like toxic
assets on a threatened bank's balance sheet (or asbestos on pipes
in the basement), the past due debt would be in effect packaged
up and insulated from repayment and from the ongoing transactions
between the parties; all further payments would be applied only
to then current purchases, with the past due debt to be paid not
from assets of Indian Capitol but rather from the security and
the guaranty of Mr. Mataya.[12]

---

[12] That the security, except for an $18,000 payment in late
2008, and the guaranty turned out in retrospect to be worthless,
is of no moment.  The parties intended to isolate the past due
debt and effectively did so.

The intent of the parties[13] is clear and supported by the documents and the testimony.[14]  The Court heard testimony of what constituted cash on delivery or its equivalent in the context of wholesale fuel sales late in the first decade of the twenty-first century.  That process then involved the purchaser's driver (Indian Capitol) using the personal identification number (PIN) or code issued by the seller (BHA) to obtain a load of fuel from a distributor (such as Chevron, Western Refining, Holly Energy Products, et al.).  Immediately upon completion of uploading the fuel from a third-party refinery or dispensing station, the truck driver received a bill of lading or delivery receipt detailing the amounts and prices of the various fuels delivered to the driver.  The bill of lading would be delivered by the driver that day or the following day to the office of the purchaser (in this case, Indian Capitol), which would then send the bill of lading to BHA.[15]  The seller received a copy of the bill of lading or other papers evidencing the transaction and its details by fax

_____

[13] Neither party called Mr. Mataya as a witness, by deposition or otherwise.  So the Court's finding about the intention of the parties is based largely on the testimony of Mr. Hall and the documentation.

[14] The Court found all the witnesses credible, although Messrs Dill and Hall had more information, and more useful information, at their fingertips in response to questioning.

[15] BHA also received documentation of the sale from the third party.  Whichever documentation arrived first would be used by BHA to collect from Indian Capitol.

either from the purchaser or the distributor[16]. The seller created the invoice and delivered of the invoice to the buyer immediately. The buyer would then, pursuant to any agreement with the seller, pay immediately, or within ten days, or some other period of time, by ACH, wire transfer or cashier's check. That was the process followed here, albeit with the checks at issue being received eight and eleven days respectively following the issuance of the invoices.

It appears from Hall exhibits 68 - 72 that Indian Capitol faxed the five bills of lading to BHA the same day they were issued. When BHA received the bills of lading, it issued invoices that same day. In turn, when Indian Capitol received the BHA invoices, it wire transferred funds shortly thereafter to pay the invoices. See Hall exhibit 1 (showing wire transfers on April 2, April 3, April 6, April 10 and April 13). The two payments at issue covered fuel deliveries and invoices issued eight and eleven days earlier. (The tenth calendar day was a Sunday, so the April 13 wire transfer took place on the next business day, a Monday.)

Hall exhibit 2 shows the larger picture of all the transfers that took place following the agreement reached by Messrs Hall

---

[16] The direct and virtually instantaneous delivery to the seller from the distributor that the PIN or code is being used and fuel delivered to a buyer, and what amounts of what types of fuel has then been uploaded, is a much more recent development.

and Mataya.  What it shows is that, other than two payments made
on January 16 and January 23, 2009, which were 11 and 10 days
respectively after the applicable invoices, the payments on
invoices dated February 1 and afterward, and paid on February 3
and afterward, were made 2, 1, 2, 0 (same day), 6, 1, 1, 1, 3, 3,
2, 2, 3, 4, 1, 1, 1, 3, 3, 4, 2, 2, 5, 8 and 11 (the latter two
the payments in issue).  So it appears from Hall exhibit 2 that
the agreement rather quickly devolved into one in which several
invoices would be paid at once, shortly after the deliveries had
been made.[17]

Mr. Hall made clear that Indian Capitol was not on a pre-pay
basis, but rather on a "COD" basis[18], which he defined as Indian
Capitol being required to pay as soon as it received an invoice,
or that payments were to be applied to "current" invoices.  He
considered the $25,000 payments to have been applied to "current"
invoices, although it is clear to the Court that the unpaid
invoices of April 6 could be characterized as "more current".
Mr. Hall's definition of COD also comprehended that the time
between the uploading of the fuel and the receipt of payment
could be several days.  And Mr. Hall made clear that as an

---

[17] In any event, none of the payments starting in February
2009 were intended to be applied to the $907,000 debt, and none
were.

[18] As explained below, Mr. Thompson did not consider the
payment terms to be COD.

Case 11-01060-s   Doc 44   Filed 08/10/12   Entered 08/10/12 14:33:47 Page 11 of 23

outside limit, Indian Capitol was not supposed to routinely have ten days to pay. As it turned out, of the two $25,000 payments, one is ten days (actually eleven, given that the tenth day is a Sunday) and the other rather close to that.

The testimony of BHA's Chief Financial Officer Jerrad Thompson was somewhat unclear and incomplete (although the Court is not disputing his veracity); there were several questions he could not answer. Among the things he did testify about, however, was whatever the arrangement between Indian Capitol and BHA was, it was not COD. He characterized it simply as payment required when the invoice was sent out, which matched Mr. Hall's description. Mr. Thompson testified that sometimes, depending on how long it took the bills of lading or the distributor's invoice to reach BHA, it might be eight to ten days to generate an invoice. Once the bill of lading or other paperwork reached BHA, however, the invoice would be created and sent as soon as possible. Clearly BHA wanted payment very soon after the invoice was issued. The Court is comfortable that, whatever the labels or characterization the two witnesses – Messrs Hall and Thompson – attached to the understanding about the payment terms, the agreement was in effect that Indian Capitol would have very few days to make the payments from when it obtained the fuel and was invoiced.

Case 11-01060-s    Doc 44    Filed 08/10/12    Entered 08/10/12 14:33:47 Page 12 of 23

"[T]here is a trend away from a 'bright line' or rigid approach to a case-by-case determination of whether the exchange was, in fact, substantially contemporaneous." Robert Ginsberg, Robert Martin and Susan Kelly, Ginsberg & Martin on Bankruptcy, section 8.03 (2012) ("GMBKR") (citing, inter alia, Peters v. Wray State Bank (In re Kerst), 347 B.R. 418 (Bankr. D. Colo. 2006)). In Kerst, the Court ruled that a motor vehicle lien perfected by the bank 47 days after the money was initially loaned was a substantially contemporaneous transfer. The perfection required the release of the lien by the prior lienholder, and it took a month and a half for the prior lienholder to release its lien and deliver the title to the vehicle. The bank and the debtor had intended the transaction, including both the advance (used to pay the prior lienholder) and the receipt of title and perfection of the new lien, to take place substantially contemporaneously. Id. at 420. Under these circumstances, the Kerst court, noting the use of the term "substantially contemporaneous" as opposed to a specific deadline that Congress could have opted for, such as in §547(e)(2) (ten-day [now 30-day] time limit for transfer to have been accomplished), adopted the analysis of the Seventh Circuit in Pine Top Insurance Company v. Bank of America National Trust and Savings Association, 969 F.2d 321 (7th Cir. 1992).[19]

---

[19] Neither the Tenth Circuit nor the Tenth Circuit BAP have directly ruled on the specific issue.

> The focus of the "in fact" prong of the [Dean v. Davis, 242 U.S. 438 (1917)] test is obviously on the temporal proximity between the issuance of credit and transfer of assets to secure that credit. However, the modifier "substantial" makes clear that contemporaneity is a flexible concept which requires a case-by-case inquiry into all relevant circumstances ( e.g., length of delay, reason for delay, nature of the transaction, intentions of the parties, possible risk of fraud) surrounding an allegedly preferential transfer. We conclude that the two- to three-week delay here did not defeat the substantially contemporaneous nature of this exchange.

Id. at 328. (Citations and footnote omitted.) In this instance, the transfers at issue occurred eight and eleven days after the dates the invoices were issued. By almost any standard[20], those time periods qualify as "substantially contemporaneous". Compare, for example, DPI Food Products, 296 B.R. at 46 (payments applied to invoices 43 to 95 days old were not substantially contemporaneous).

It is true that the payment terms on the invoices consistently referred to "Net 10 days" and due dates for payment

---

[20] As GMBKR points out, there is contrary authority, perhaps most prominently Ray v. Security Mutual Finance Corp. (In re Arnett), 731 F.2d 358 (6th Cir. 1984), which conformed the outside time limit of §547(c) with the ten-day limit of §547(e)(2) (as the latter section then provided) since the contemporaneous exchange was supposed to be treated similarly to the cash transactions envisioned by §547(e)(2). Id. at 361-62. The Court agrees with the reasoning of the Kerst court, 347 B.R. at 424-26, and the several other decisions cited in Kerst, that Arnett incorrectly limited the time limit for a substantially contemporaneous transaction to ten days. Of course, if the Arnett analysis were applied using the thirty-day time limit currently permitted by §547(e)(2), these two payments would clearly be timely anyway.

were ten calendar days from the date of the invoice.  But the testimony was clear that Messrs Hall and Mataya had agreed on immediate payment.  That BHA's paperwork was not in absolute conformity with the reality of the exact payment arrangements is less important than the clarity of the parties' explicit agreement.

Trustee also argued out that as of April 10 and April 13, there were more recent invoices – the ones from April 6 – that were also outstanding, and that the agreement to pay the invoices immediately mandated that they be paid rather than the ones that were paid.  As is apparent from the authority cited, the payments made were appropriately applied to the invoices that were in fact paid so that the payments were substantially contemporaneous.  The fact that there were other invoices that could have been paid and would also have qualified as substantially contemporaneous does not detract from the status of these payments as having been made substantially contemporaneously.  And in any event, the authority cited also makes it clear that a little (or even a lot of) "play in the joints" is acceptable.

Finally, there remains the somewhat discordant fact that agreement was for immediate payment of invoices when received, but that by early April the payments were in fact made closer to ten days after invoice.  But the statute only calls for a substantially contemporaneous exchange of payment for new value,

Case 11-01060-s   Doc 44   Filed 08/10/12   Entered 08/10/12 14:33:47 Page 15 of 23

and for the parties to have intended a substantially
contemporaneous exchange.  These transactions, including the two
at issue, literally met those standards, even if there was some
discrepancy between specifically what was agreed on and what
actually happened.

**Section 547(c)(2)(B) defense:**

BHA insists that the two $25,000 payments were made
according to "ordinary business terms."  The Court agrees.

> [Former] §547(b)(2)(C) [now § 547(c)(2)(B)] requires
> that DPI successfully raise and prove that the payments
> it defends were or are consistent with the (presumably
> broad) range of arrangements that take place between
> creditors and healthy debtors in the applicable segment
> of the industry.

Gonzales v. DPI Food Products Co., 296 B.R. at 45.  DPI relied
heavily on Clark v. Balcor Real Estate Finance, Inc. (In re
Meredith Hoffman Partners), 12 F.3d 1549 (10th Cir. 1993), cert.
denied, 512 U.S. 1206 (1994):

> Ordinary business terms therefore are those used in
> "normal financing relations": the kinds of terms that
> creditors and debtors use in ordinary circumstances,
> when debtors are healthy.  Such terms do not raise the
> dangers that the preference section seeks to avoid.
> Even arrangements that creditors commonly try to use
> when a debtor is struggling may give a creditor an
> advantage over others and precipitate bankruptcy.

Id. at 1553.  Meredith Hoffman Partners is still the governing
precedent for this circuit.  See Jobin v. McKay (In re M & L
Business Machine Company, Inc.), 84 F.3d 1330, 1339 (10th Cir.),
cert. denied, 519 U.S. 1040 (1996).

The § 547(c)(2) defense is narrowly construed.  In re M&L
Business Machine Co., 84 F.3d at 1339; Payne v. Clarendon
Nat'l Ins. Co. (In re Sunset Sales, Inc.), 220 B.R. 1005, 1020
(10th Cir. B.A.P. 1998).  BHA has the burden of proof (both
coming forward with evidence and persuading the Court) for its
§547(c) defenses.  §547(g).  The standard of proof is a
preponderance of the evidence.  M & L Business Machine Company,
Inc., 84 F.3d at 1339 (citing Meredith Hoffman Partners, 12 F.3d
at 1553).

BHA's expert witness Mr. Rod Honstein testified that the
terms agreed upon for the new purchases – payment by wire
transfer on or about ten days after invoicing for truckloads of
fuel sold to a fuel retailer – were ordinary in the industry for
these sorts of purchases.  See Hall exhibits 4 and 80 (affidavit
of Mr. Honstein summarizing his testimony).  Mr. Honstein
emphasized in his live testimony that these were ordinary
business terms between healthy buyers and sellers.

To establish what the overall industry practices are, the
creditor (ordinarily) cannot rely solely on its own experience
with other customers, In the Matter of Midway Airlines, Inc., 69
F.3d 792, 798 (7th Cir. 1995); Logan v. Basic Distribution Corp.
(In re Fred Hawes Org., Inc.), 957 F.2d 239, 246 (6th Cir. 1991),
or the debtor's arrangements with other creditors, Gulf City
Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In the Matter of Gulf
City Seafoods, Inc.), 296 F.3d 363, 368 n. 5 and 369 (5th Cir.

2002), or even both. Id., at 368 n. 5.  Evidence about the practices of other creditors and (in the Tenth Circuit, healthy) debtors in the industry is required. Id.  A defendant "may not derive the standards and practices of the industry from its own practices and must present evidence of the actual practices of its competitors."  Grigsby v. Purolator Products Air Filtration Co., Inc. (In re Apex Automotive Warehouse, L.P.), 245 B.R. 543, 550 (Bankr. N.D. Ill. 2000).

Mr. Honstein's testimony was not limited to the relationships between BHA and its customers.  He was qualified as an expert in the area of business terms between buyers and seller in the fuel distribution business in New Mexico.  He testified about a variety of other sellers and distributors around the state and what their terms of sale were with their buyers.

Trustee cited Rocin Liquidation Estate v. Alta AH & L (In re Rocor International, Inc.), 352 B.R. 319, 335-36 (Bankr. W.D. Okla. 2006) in support of his argument that Mr. Honstein had not "drilled down deep enough" (the Court's phrase) in establishing what are the normal business terms among the sellers and buyers in New Mexico.  The Court has no disagreement with the Rocor decision.  But the Court finds the decision inapposite because the Court finds that Mr. Honstein clearly had the requisite experience to know what the ordinary business terms in the industry were, even if his specific research for this testimony was somewhat limited.  It is true that Mr. Honstein's empirical

research was on the skimpy side, but it provided enough of a factual basis for the opinion rendered. Overall, the Court found Mr. Honstein's testimony credible and helpful to the Court in making its findings about the broad range of ordinary business terms in the fuel distribution industry in the state of New Mexico.

Among other things, Mr. Honstein testified that ordinary business terms can include payment by ACH, wire transfer or cashier check. And he testified that the broad range of ordinary business terms in 2009 could include payment dates ranging from ten days to twenty days (for retailers, for example) to thirty days (state agencies, school districts) to forty-five days (such as national companies operating coal mines).

The Court concludes that ten days for payment from invoice date clearly qualifies as ordinary business terms.

Trustee argued that Mr. Honstein's testimony could not be relied on because he had to be biased: his company was also the target of a §547(b) action by the Trustee, and the settlement of that action, together with prepetition unpaid deliveries to Indian Capitol, resulted in a total loss of almost $800,000. Of course it would be odd if Mr. Honstein were not frustrated and angry about this result, especially given the size of his loss. But there was not much in the simple and straightforward testimony that was susceptible of shading in favor of the BHA.

Case 11-01060-s   Doc 44   Filed 08/10/12   Entered 08/10/12 14:33:47 Page 19 of 23

Ten-day (and longer) payment terms are simple and commonplace in many industries, and Mr. Honstein's testimony that wire transfers, ACH transfers and even cashier's checks are all common in the industry fits within the rubric that in making this decision, the Court must take into account the "broad range" of industry practices that are "ordinary". See DPI, 296 B.R. at 44. And in any event, the Court does not find anything in Mr. Honstein's testimony or demeanor that would suggest he would have otherwise rendered the opposite opinion.

Trustee also argued that but for the arrangements that Messrs Hall and Mataya reached securing the repayment of the $907,000 with Mr. Mataya's real estate, BHA would not have applied the payments at issue only to the later deliveries of fuel.[21] Alternatively put, Trustee argues that securing the repayment of the $907,000, including obtaining a guaranty of Indian Capitol's debt from Mr. Mataya (equally useless) and a judgment against Indian Capitol has to be taken into account in deciding whether this was within "ordinary business terms" (for a healthy debtor). It is true that the entire relationship between Indian Capitol and BHA needs to be taken into account. But with

---

[21] The securing of the $907,000 debt of course turned out to be entirely ephemeral. As the CM file of the main case makes clear, and as Mr. Hall learned to his considerable dismay, the real estate Mr. Mataya pledged to BHA, and to others as well, was already so heavily encumbered as to have almost no value for any of the later pledgees, including BHA.

respect to these specific payments, none of them went to repay any part of the $907,000, and instead went only to pay for recently purchased fuel shipments.  Indeed, almost always, a payment that meets the requirements of §547(c)(2) will have been made in the context of a larger antecedent debt.  And the "healthy debtor" standard does not require that the debtor in question be healthy – again, almost by definition, such a debtor will not be healthy.  Rather it must be the transaction itself that would be typical for a healthy debtor to engage in.  These payments meet these standards.  To rule otherwise – that is, to rule that taking into account the insulation of the $907,000 past due debt must necessarily taint any part of the relationship between the two parties – would in effect eliminate the §547(c)(2) defense in any case.

**CONCLUSION**

The Court of course is not free to merely decide on some vague policy, business or "equitable" basis what qualifies as an exception or an affirmative defense to §547(b).  See, e.g. Gonzales v. Food Marketing Group (In re Furr's Supermarkets, Inc.), 320 B.R. 1, 6 (Bankr. D. N.M. 2004) ("[Section] 547(c) is the exclusive list of [affirmative] defenses available to preferential transfers.").  At the same time the specific terms of the defenses provided by §547(c) are not so precisely defined (compare 30-day time limits of §547(e)(2)) that they do not admit

of some need for interpretation, as is evidenced by the myriad cases on the subject. Thus the Court is entitled to look at the purposes of §§547(b) and (c) in interpreting the reach or breadth of §547(c) defenses, and that includes determining whether there has been a loss to the estate that ought to be recovered for the creditors or on the other hand a payment by the debtor that should not be recovered because the payment furthers one of the goals of the Code.[22] Under the facts of this case, the parties intentions and behavior were in close enough conformity with the statutory language to qualify for the protection of §§547(c)(1) and 547(c)(2)(B).

The strategy of recognizing the loss of approximately $907,000 and moving beyond that to begin a new relationship with Indian Capitol allowed BHA to be paid, and subsequently keep, payments for (most of) the fuel purchased in the final months

---

[22]     On the one hand the preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.
Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.), 18 F.3d 217, 219 (3rd Cir. 1994).

Case 11-01060-s   Doc 44   Filed 08/10/12   Entered 08/10/12 14:33:47 Page 22 of 23

before Indian Capitol filed its chapter 11 petition without giving BHA an undue advantage over other similarly situated creditors. At the same time, the arrangement kept Indian Capitol supplied with fuel for its operations, and perhaps delayed the filing of the petition. These are results that are entirely consistent with the goals of the Bankruptcy Code, and specifically of the affirmative defenses allowed by §547(c). Since BHA met its burden of proving the affirmative defenses of "contemporaneous exchange" and "ordinary business terms" as required by §§547(c)(1) and (c)(2)(B) respectively, the complaint must be dismissed.

_____
Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket: August 10, 2012

Copies to:

James A Askew
Arland & Associates, LLC
201 3rd ST NW, STE 505
Albuquerque, NM 87102-3331

Victor E Carlin
Moses Law Firm
PO Box 27047
612 First Street, NW
Albuquerque, NM 87125-7047